# Scott v. Standard Oil Co.

*Bill in Equity to enjoin Infringement of Trade-mark.*

1. *Trade-mark; what constitutes it.*—A trade-mark is a name, figure, letter, symbol, word, form or device used by a manufacturer or merchant to designate the goods he manufactures or sells, and to distinguish them from those manufactured or used by others, to the end that they may be known in the market as his, in order that he may reap the benefit of such profits as result from a reputation for superior skill, industry or enterprise; and to procure the protection of the courts from infringement, the name, symbol or device used as a trade-mark must be such as to distinguish the goods from others and to indicate the origin and ownership of the article to which they are applied.

2. *Same; words may be so used.*—A mere word or words in a certain sequence may constitute a trade-mark, the exclusive use of which a court of equity will protect; but to entitle words to this protection they must designate and distinguish the article to which they are attached and indicate the origin and ownership of such article; and

[Scott v. Standard Oil Co.]

such word or words must be arbitrary in selection and meaning which by reason of application to a particular class of merchandise will indicate its ownership and origin, as distinguished from being descriptive and adjective, which from their usual meaning and intrinsic significance necessarily denote or describe the character, quality, materials or grade of the goods upon which they are used.

3. *Same; "Fire-Proof Oil," no trade-mark.*—Where the words "Fire-Proof Oil" are used to designate a certain quality of illuminating oil, and are always used upon a label in connection with the name of the manufacturer of such oil and the name of his place of business, such words are descriptive of the oil to which they are attached and indicate the grade, quality and characteristics of such oil, affirming its high degree of purity, which makes it fire-proof against explosion, and as originally used in no way indicated the origin and ownership of such oil, and they can not be appropriated to exclusive use as a trade-mark; and the fact that by continued use of such words upon oil of a certain grade by a particular manufacturer alone and by long association with his name and products they have come to denote in and of themselves origin and ownership will not entitle them to protection from use by others.

4. *Same; manufacturer entitled to protection against imitations of labels.*—A manufacturer or merchant is entitled to protection by injunction or otherwise against a wrongful or fraudulent imitation of his distinctive label, though the label is not a trade-mark, and contains no word, sign or symbol filling the definition of a trade-mark or that can be protected as such.

APPEAL from the Decatur City Court, in Equity.

Heard before the Hon. WILLIAM H. SIMPSON.

The bill in this case was filed on September 24, 1892, by the appellee, the Standard Oil Company, against the appellants, W. D. Scott and the Southern Oil Company. It was averred in the bill that ten years or more before the bill was filed, complainant realizing the need of a superior grade of illuminating oil, after experimenting and developing, succeeded in producing from petroleum an illuminating oil of fine quality, giving a bright light, when burned in lamps, burning very freely, emitting but a minimum of gas and offensive odors, and charring the wick or smoking a lamp chimney in which it might be used, less than any other brand of oils. To this quality or grade of oil complainant gave the name of "Fire-Proof Oil," which has never before or since its adoption been used with reference to any product of kerosene or petroleum, except as hereinafter set out. By the application of time, labor and capital, and the

[Scott v. Standard Oil Co.]

efforts of many agents scattered over a large extent of territory, the said brand known as the "Fire-Proof Oil," became well and favorably known. The complainant expended sums of money approximating fifty thousand dollars in advertising said oil and introducing it and building up a trade therefor. By the outlay of capital and the exercise of energy and owing to the peculiar merits of said oil, there has grown up a great and increasing demand for that brand of oil, and the sales thereof are quite large, and said brand is growing in favor all the time. The combination of the words "Fire-Proof Oil" was original with the complainant. It had never previously been used to designate a quality of petroleum. The brand was intended to indicate the origin of the particular kind of oil and did so designate it, by being understood to be of the manufacture of the complainant; and by and since its introduction into general use it has come to be known and recognized as the manufacture of the Standard Oil Company. It was averred that the name "Fire-Proof Oil," does not indicate the quality or any of the essential characteristics of the oil, and is not truly a descriptive term of the oil; that it was adopted by the complainant solely for the purpose of distinguishing its product which was branded or marked with said words, and its exclusive appropriations for that purpose in no way restricts others from properly describing a similar article, produced by them, if they can produce a similar article; and that it would not convey to a person who had never seen it a correct idea of the qualities of the oil. It was further averred that there is no such article known to commerce as fire-proof oil, other than the peculiar oil which the complainant has given that brand; that there can be no such thing as fire-proof oil in the literal acceptation of the term; that the term fire-proof, when applied to the products of kerosene and petroleum deceive no one, since all men know that such products cannot be fire-proof; that the selection of the name and brand was merely arbitrary and fanciful, and has been used in connection with complainant's name to indicate the origin and ownership of the oil so manufactured by it; that the name in connection with oil was so novel and original as to excite speculation, and arouse curiosity, which further tended to elicit inquiry as to what the oil was, and conse-

quently, advertise the produce by exciting attention and fixing the name in the memory of persons hearing it on account of its extreme originality. It was further averred that for some time past and during the year 1892, the said defendant, Scott, has at various times and places, in different States, been buying oil in car load lots and selling the same as fire-proof oil, and as the genuine ''Fire-Proof Oil,'' and has so billed it to his customers. He has labelled the barrels, however, in order to protect himself from the consequences of infringing the complainant's trade-mark, as ''Super Fire-Proof Oil,'' the mark ''Super'' being placed above the word ''Fire-Proof,'' as will be hereafter more fully shown; but he has sold it as fire-proof oil, and has billed it to his customers. His methods of procedure have been to stop at an important railroad town, and have shipped to him there a tank-car of oil containing 60 barrels or more of ordinary quality, and sell just such ostensible goods or brands as might be desired at such points where the complainant had established a reputation, and a trade for its fire-proof oil; the defendant Scott has put this ordinary oil in barrels, labelled and branded it as ''Fire-Proof Oil,'' with the word ''Super'' above, and sold it as the genuine ''Fire-Proof Oil;'' but, if a customer desired a quality of oil known and designated as ''Water White,'' or ''Prime White,'' which are common and cheap qualities of oil dealt in by the complainant, and by the trade generally, the said defendant Scott filled barrels with oil known as such common grades taken from the same tank as the oil which he sold as ''Fire-Proof Oil,'' and those common and cheap oils he has sold at a cheaper price than the fire-proof so-called, or at the same price according as he could make a sale.

It was further averred in the bill that the defendant Scott has pursued the above course of dealing at various places,and that by reason of being able to sell the common oils of comparatively poor quality as the original and genuine fire-proof oil, he is interfering with the established trade and injuring the reputation of the defendant as a manufacturer and the originator of the fire-proof brand, and will still further interfere with the sale and will irreparably damage the reputation of the complainant's said fire-proof brand, and thereby irreparably damage the complainant in his business. In all the above trans-

actions said Scott has held himself out as the representative of the Southern Oil Company, but has spent only a short time at each place, rarely selling or attempting to sell more than one car load of oil at each place, but is now disposing of a car load at Decatur in the manner above set forth. In connection with the words "Fire-Proof Oil," originated and for a long time dealt in exclusively by the complainant, it adopted and used a peculiar label, brand or device, being of paper, printed in different colors, having different figures, curves and scrolls in connection with the name of the oil, and of the complainant. The label is circular and pasted on the head of oil barrels. Around the upper half are the words "Standard Oil Company," a little above the center is the complainant's monogram. Below the center of the label is a curved or elliptical bar extending from one to the other side of said label, on which are the words "Fire-Proof," underneath which is the word "Oil," and around the lower part are the words "Louisville, Ky.," in a circular form. This label or device was originated by the complainant several years ago, and was not before in use and has not been since, except by the complainant and defendants. The complainant has used said device solely in connection with what it has named its Fire-Proof Oil. Upon many of the barrels containing the oil which defendants sell and ship as "Fire-Proof Oil," they affix a label or device circular in form upon the ends thereof with figures, scrolls and devices, some of which are similar to those upon the label used by the complainant. Around the upper half are the words "Southern Oil Company," a little above the center is the word "Super," printed in an upward curve Below the center of the label is a curved or elliptical bar extending from one to the other side of said label on which are the words "Fire-Proof," underneath which is the word "Oil." These three last-named words are arranged precisely alike on the two labels, and in precisely the same manner; and the letters thereof are about the same size on each label.

There are many points of similarity in the two labels. The label used by the defendants is calculated to deceive and does deceive unless an attentive inspection is made. A casual or ordinary observer would not be likely to distinguish between them unless seeing them side by side.

[Scott v. Standard Oil Co.]

It is further averred in the bill that all these acts have been and are being done without complainant's consent, and greatly to its injury. In large towns it is always an easy matter to procure barrels that have been used by the complainant and bearing its name and label, from which the oil has been drawn. The barrel is then nearly as useful as ever and can be bought as cheap or cheaper than new barrels. Such actions on the part of said defendant will tend still further to defraud the complainant as well as its customers; and to injure its trade and its reputation. All the above acts complained of have and are being committed by the said defendant Scott, professing to represent the alleged Southern Oil Company; and the oil so disposed of and being disposed of was not obtained from the complainant. The said defendants have each realized large profits by infringing upon the complainant's trade mark and by selling oil in barrels bearing his name and label. The amount of profits the complainant can not ascertain precisely, but believes they aggregate a large sum; to-wit, several thousand dollars. They have furthermore greatly damaged the reputation of the complainant in connection with its trade mark of "Fire-Proof Oil." The complainant does not here deny the right of defendants to sell and ship white and prime white oils provided only they are not sold or shipped in barrels bearing the complainant's trade-mark, or bearing a label infringing complainant's said trade-mark, nor in barrels bearing imitations or infringements of the complainant's trade-mark, nor label bearing the complainant's name.

It was further averred in the bill on information and belief that the defendants, the Southern Oil Company, and W. D. Scott are one and the same; that said Scott is operating under the style of the Southern Oil Company, and that it was believed that both Scott and the Southern Oil Company were insolvent.

The prayer of the bill was as follows: "The complainant prays that said W. D. Scott and the Southern Oil Company be made parties defendant to this bill of complaint by appropriate process from your honor's court. That your honor would grant to complainant the writ of i junction, enjoining and restraining the defendants and each of them from further taking orders for selling or shipping any oil bearing the mark or brand of 'Fire-

Proof Oil,' or any oil in barrels having a label in circular form with the word 'Super' a little above the center, painted in an upward curve and a curved or elliptical bar extending from one to the other side of the circular label a little below the center, bearing the words 'Fire-Proof,' and underneath that the word 'Oil,' oil bearing the brand 'Super Fire-Proof Oil,' or any oil in barrels bearing the name 'Standard Oil Company' or any oil in barrels bearing the complainant's trade-mark, except such oils as they may have procured from complainant. The complainant further prays that your honor will order that said injunction be made perpetual; and will require the defendant to account to the complainant for all profits made by them on sales, so called, of 'Fire-Proof Oil,' or 'Super Fire-Proof Oil,' and all oils in barrels bearing complainant's name, the Standard Oil Company, except such oil as they may have procured from complainant, and to that end that they be required to produce all books of accounts, all invoices, shipping receipts, bills of lading, and all other documents or memoranda tending to show amount of sales and shipments of oils contained in barrels, labelled as hereinbefore set out; and that for such profits when ascertained, a personal decree be here rendered, and that your honor will grant to the complainant a personal decree for twenty thousand dollars for damages to the trade of complainant in the 'Fire-Proof Oil,' and the reputation thereof."

Upon the filing of the bill, the judge of the city court ordered that upon the complainant entering into a bond with sureties in the sum of $15,000 to be approved by the register, that an injunction should issue according to the prayer of the bill. This bond was made, and the injunction accordingly issued as directed. There was a decree *pro confesso* against the defendant. After this decree, on the submission for final decree on bill and decree *pro confesso*, a decree was rendered declaring the complainant entitled to the relief prayed for and referring the cause to the register to ascertain and report the profits for which the defendant should account, or the damages to which the complainant was entitled. This reference was held without exceptions filed thereto, and upon the coming in of the report, the court rendered a final decree confirming the report of the register and enjoining the defendants as

prayed in the bill. The defendants appeal, and assign as error the several decrees rendered in the cause.

J. M. CHILTON, for appellant.—1. A trade-mark must either by itself or by association point distinctively to the origin or ownership of the articles to which it is applied.—*Stachelberge et al v. Ponce*, 23 Fed. Rep. 430; *Canal Co. v. Clarke*, 13 Wall. 311; Brown on Trade Marks, §§ 143–144.

2. To constitute an infringement, the imitation must be so close that by the form, marks, contents, words or their special arrangement, or by the general appearance of the infringing device, purchasers exercising ordinary caution are likely to be misled into buying the article bearing it, for the genuine one.—*McLean v. Fleming*, 96 U. S. 245; *Pratt Mfg. Co. v. Astral Mfg. Co.*, 27 Fed Rep. 492; *Radam v. Microbe Destroyer Co.*, 81 Tex. 122, and numerous cases there cited. "It is not sufficient that there may be a possibility of deception, but the offending label must be such that it is likely to deceive persons of ordinary intelligence, and the injunction will not lie where a purchaser who should read the name and brand on defendant's label, would not be deceived thereby." —*Heinz v. Lutz*, 1 Pa. A. D. V. R. 52; 22 Pitts. L. J. N. S. 255; 146 Pa. 592; 29 W. N. C. 317; 23 Atl. 314.

3. There is nothing in defendants' label to connect it even by suggestion with the label of plaintiff. Instead of the Standard Oil Co. it is the Southern Oil Company. No place of manufacture is stated, whereas, Louisville, Ky., is the place indicated on plaintiff's label. The label of the defendants' is more remarkable for its want of similarity to plaintiff's label, than for its similarity.— *Royal Baking Powder Co. v. Vouwie*, Am. Trade Mark Cases, p. 1065; Brown on Trade Marks, § 387; *Coffeen v. Branton*, 5 McLean 256.

4. Words descriptive of the *quality* of an article, cannot be made the subject of a valid trade-mark. Any other position would tend to build up monopoly by stifling competition. The words "Fire-Proof," as applied to kerosene oil, are clearly descriptive of quality. They mean, and are generally known to mean, that the oil of which they are descriptive, can be subjected to a high degree of heat without exploding. The fact that they

[Scott v. Standard Oil Co.]

are extravagant, in describing the merits of the oil, does not render them any less descriptive of quality. The following words have been held to be descriptive of quality and therefore not the subject of a valid trademark: "Dr. Johnson's Yellow Ointment," 3 Doug. 293; "Scheidam Schnapps," 18 How Pr. 64; "Aromatic Sheidam Schnapps," 13 Am Rep. 204; "Club House Gin," 7 Bosw. 222; "Parriffin Oil," 9 Iur (N. S.) 322; "Straight Cut" Tobacco, 12 Fed. Rep. 782; "Rye and Rock," 82 N. Y. 630; "Snow Flake," 67 Ga. 561, s. c. 44 Am. Rep. 735; "Night Blooming Cereus," 5 Phil. 64; "Old London Dock Gin," 28 How. Pr. 206; "Leibegs Extract of Meat," 47 L. T. (N. S.) 298; "Dessicated Codfish," 3 Daley 53; "Ferro Phosphorated Elixir Calysa Bark," 58 N. Y. 223; "Lackawana Coal," 13 Wall 311; "Razor Steel," Com. Dec. 1871, p 100.

See also many others cited in Brown on Trade Marks pp. 147-148.

5. The words "Fire Proof" are certainly descriptive of quality. If they are so extravagant as to be untrue, this, so far from entitling the complainant to relief "furnishes an additional reason why he should be denied the assistance of a court of equity."—*Ginter v. Kinney Toboc-Co.*, 12 Fed. Rep. 782. "An exclusive privilege for deceiving the public, is surely not one that a court of equity can be required to aid or sanction. To do so would be to forfeit its name and character."—*Manhattan Medc. Co. v. Wood*, 108 U. S. 218, 227, and cases there cited.

6. There is a class of words or terms which are called "suggestive" of quality and which are yet held not to be descriptive of quality. But this class is limited to those where the "descriptive character that might attach to a word is so very remote as to be but secondary, so that the word will be understood by the public not as a descriptive, but as a fanciful term; it may thus constitute a valid trade-mark."—"The Rising Sun," *Morse v. Worell*, 10 Phila. 168, s. c. Am. Trade Mark Cases, p. 8; "Anti Wash-Board," in *O'Rourke v. Central City Soap Company*, Am. Trade Mark Cases, p. 1043. "Fire Proof" as applied to kerosene oil, is not remotely or secondarily descriptive. It would not be "understood by the public" as a fanciful term, but would be, and is understood as indicating the non-explosive character of the oil, under high degree of heat.

E. W. Godbey, W. L. Martin and Thomas G. Jones, *contra*.—1. The complainant has a valid, subsisting trade-mark, in the word "Fire-Proof" which was not descriptive of any quality of the oil, or if so, only remotely descriptive or suggestive, and therefore valid; being first applied by complainant to any product of kerosene, and the name indicates by association in the public mind origin and ownership.—Brown on Trade Marks; §§ 150, 151: *Symonds v. Jones*, 17 Am. St. Rep. 485, 489; *Selchow v. Baker*, 45 Am. Rep. 169, 173; *Congress, etc. v. High Rock Congress Spring Co.*, 6 Am. Rep. 82; *Lawrence v. Lowell*, 37 Amer. Rep. 362; *Liggett etc. v. Myers etc.*, 24 Am. St. Rep. 313; *C. F. Simmons Med. Co. v. Mansfield*, 23 S. W. Rep. 165, 180; *Hier v. Abraham*, 37 Am. Rep. 589, 592; Brown on Trade Marks; §§ 135, 150, 151, 273, 220, 237, 397, 450, 275, 274; *Waterman v. Shipman*, 29 N. E. 111; 29 Fed. Rep. 102; *Improved Fig Syrup Co. v. California Fig Syrup Co.*, 4 C. C. A. 264; 56 Fed. Rep. 834, 837, 839; *Hiram Holt Co. v. Wodsworth*, 41 Fed. Rep. 34, 35; *O'Rourke v. Central City Soap Co.*, 26 Fed. Rep. 76; Amer. Trade Mark Cases, 361, 363, 1048, 1051, 350, 477.

2. The symbol or label, the arrangement of the words "Fire-Proof Oil" were also Trade Mark.—*Congress etc. v. High Rock Congress etc.*, 6 Am. Rep. 82, 86; *Hier v. Abrahams*, 37 Amer. Rep. 591; *Popham v. Cole*, 23 Amer. Rep. 22; *Paterson v. Berry*, 33 Amer. Rep. 328, 329; *Gillott v. Easterbrook*, 8 Amer. Rep. 553; *McLean v. Fleming*, 96 U. S. 251; *Pierce v. Guitard*, 58 Am. Rep. 1; *Metcalf v. Brand*, 9 Am. St. Rep. 282, 293; *Association v. Clark*, 26 Fed. Rep. 410; *Lawrence v. Lowell*, 37 Am. Rep. 362; *Pratt's Appeal*, 2 Amer. St. Rep. 676, 678; *Kellor v. Goodrich*, 10 Am. St. Rep. 88, 89; *Ligett v. Reid*, 24 Am. St. Rep. 313, 314, 315; 56 Fed. Rep. 834, 837, 839.

3. The words "Super Fire Proof" and the device used by Scott was a clear infringement, though distinct in some respects.— *Wolf v. Barnett*, 13 Amer. Rep. 111; *Congress etc. v. High Rock Congress, supra; Improved Fig Syrup Co. v. California Fig Syrup Co.*, 4 C. C. A. 264; American Trade Mark Cases, 1048, 1051; *Gillott v. Easterbrook, supra; Russis Cement Co. v. LePaige*, 9 Amer. St. Rep. 685; 23 Am. St. Rep. 537; *Keller v. Goodrich Co.*, 10 Amer. St. Rep. 88, 90, 92; *Von Mumm v. Frash*, 56 Fed.

[Scott v. Standard Oil Co.]

Rep. 830,839; *Simmons v. Mansfield*, 23 S. W. Rep. 161, 180, 181.

4. Selling oil in barrels bearing complainant's name, and its own *exact* trade-mark and label, was a clear infringement, which will not be denied.

5. As to the question of damages allowable for such infringement, see *Wolfe v. Barnett, supra*; *El Madello Cigar Mfg. Co. v. Cater*, 23 Am. St. Rep. 537, 543; *Root v. Railway Co.*, 105 U. S. 189; *Avery v. Meikle*, 7 Am. St. Rep. 604, 608; *Graham v. Plute*, 6 Amer. Rep. 639.

McCLELLAN, J.—There was a decree *pro confesso* against W. D. Scott and the Southern Oil Co., the sole defendants to this bill; a submission for final decree on bill and decree *pro confesso*; a decree declaring the complainant entitled to relief, and referring the case to the register to ascertain and report the profits for which the defendants should account, or the damages to which the complainant was entitled; a report upon said reference to which no exceptions were filed; and a final decree enjoining the defendants as prayed in the bill, confirming the report of the register as to profits which defendants had made through the infringement of complainant's alleged trade-mark, fraudulent imitation of complainant's label and fraudulent use of packages or barrels labelled by complainant and previously used by it in the sale of oil, but which the defendants procured after they had been emptied of their contents and refilled and sold, and adjudging the defendants liable to the complainant for the amount of said profits. From that decree both defendants prosecute this appeal, though they did not appear at all or for any purpose in the city court nor before the register on reference. It is conceded that the defendants, notwithstanding their being in contempt below, may on this appeal question and have passed upon the equity of complainant's bill.

A prominent question in the case, going to the equity of the bill in part, is whether certain words stamped upon or affixed to packages of goods sold by the complainant constituted a trade-mark. Of course, it is well settled that a mere word, or several words in a certain sequence, may constitute a trade-mark the exclusive use of which the courts will protect. To entitle words to this protection, however, they must indicate the source

[Scott v. Standard Oil Co.]

or origin and the ownership of the article to which they are attached. By this is not meant that such indication shall result from their intrinsic significance, but it may well be the consequence of such continued and uniform use of them by a manufacturer or dealer as to create in the mind of the public an association between the words and the commodity to which they are attached, on the one hand, and the manufacturer or dealer or the place of manufacture on the other; so that mere words which upon their face import no reference to or connection with the dealer in or owner or manufacturer of goods to which they are constantly affixed, not any index to their origin, may, because of their customary use upon the goods of a certain person, come to indicate very clearly that a particular package bearing the mark of them was produced by or belongs to that person.

But a word which is the name of the thing to which it is affixed cannot become a trade-mark in respect to that thing, nor words which describe the thing to which they are attached and indicate its characteristics, its virtues, the quantity contained in the package, &c. &c. For if the thing is not patented all men have the right to make and vend it, to the use of its name and to every word in the language to aptly describe it; and the exclusive use by one of words which are thus necessary to all and equally belong to all will not be protected.

It not infrequently happens—very generally indeed— that words used for the purposes of a trade-mark, and which either in themselves as originally used denote only origin or ownership, or by user come in the public mind to indicate origin or ownership though intrinsically importing nothing of the kind, come finally to a sort of adjective or descriptive significance in respect of the wares upon which they appear, and to be in the nature of an assurance that the commodity possesses certain virtues and qualities. But this is not because the words themselves are descriptive of the thing, but because they point to an origin or ownership known by experience to be the source, or the manufacturer or vendor, of goods of certain qualities. The words do not describe the thing, but they indicate who made it. This knowledge of the maker involves an assurance of quality, through the reputation which articles manufactured by him and put on the market under his mark has acquired. This

reflex descriptive quality in words which, dissociated
from their use in connection with the article, are not de-
scriptive of it at all, constitutes indeed the chief value
of trade-marks composed of them both to the manufac-
turer or dealer and the public.  Such words are not de·
scriptive in the sense of the proposition stated next
above ; and that they come in this indirect way to show
quality is no objection to their employment in trade-
marks, since their exclusive use by one would not de-
prive another of the full vocabulary of primarily de-
scriptive words to which the public are entitled and to
which these do not belong.

On the other hand, it is often the case that words used
as, and intended to constitute, trade-marks · and which
are primarily and intrinsically descriptive merely, come,
by their continued use by one person to mark goods man-
ufactured or sold by him, to clearly indicate the origin
and ownership of such goods.  But they do not thereby
lose their primary meaning or become the exclusive pro-
perty of the person who thus uses them.  They con-
tinue to ɔelong to the common vocabulary of adjective
words, and as such the public have a right to use them
in the description of its wares which cannot be inter-
fered with by the courts on the theory of preventing in-
fringement of trade-marks.  Such words, however clearly
they may finally come to perform the legitimate offices
of a trade-mark by indicating origin or ownership, still
have their primary significance and they cannot be
wrenched out of their places as descriptive words for
the common use of all, merely because one of the public
has assumed for a time to use them for a purpose the
law does not warrant.—26 Am. & Eng. Encyc. of Law,
pp. 289–300, 302–305 ; Browne on Trade-Marks, Chap-
ters III and IV ; *Manufacturing Co. v. Trainer*, 101 U.
S. 55.

In the case at bar the complainant claims as its trade-
mark, in respect of a certain brand or grade of coal oil
manufactured and sold by it, the words "Fire-Proof
Oil."  These words, it is alleged—and proven for all
the purposes of this case—were first used by the com-
plainant, as a part of the brand or label for barrels of
oil of a certain excellent quality, many years ago and
have been ever since so used by it, that they had not
been so used by others for this purpose before their

adoption by complainant, and have not since then been so used except by the defendants. It appears also that by their uniform and long continued use upon barrels of oil of a certain grade by the complainant alone, these words upon such packages have come by association with the name of the complainant in the public mind to denote in and of themselves the origin and ownership of the commodity to which they are attached, though originally of course they did not afford any indication of origin or ownership. And by further association of ideas, as it also appears in the case, the words, wholly apart from any intrinsic significance they may have, have come also to indicate a certain excellence of quality in the oil to which they are affixed through the reputation which oil of this brand manufactured by the complainant has acquired. On the principles stated above, neither the fact that the words did not originally indicate the source or ownership of the commodity nor that they now indirectly give assurance of its quality can hinder the complainant in its effort to have its exclusive use of them as a trade-mark protected; and on the other hand, if the words disconnected from their long association with complainant's products, are descriptive thereof, the fact that their use in this connection had also made of them a symbol or index of origin or ownership would not justify their attempted appropriation to the purposes of a trade-mark.

So that the real and only inquiry on this branch of the case is as to whether these words in the collocation of their use are descriptive of the article to which they are attached, and in and of themselves, as thus arranged, indicate the grade, quality, characteristics &c. &c. of such article, and did so indicate quality &c. when they were first used by complainants in this way. The question is not without difficulty even upon principle, and the difficulty is rather enhanced than relieved by adjudication of courts and departments. The trouble does not, of course, arise upon the literal and abstract meaning of the words ''Fire-Proof;'' that is clear enough—proof against fire, incombustible—but upon their meaning as used here in collocation with and having manifest reference to (an illuminating) ''Oil.'' We know that in a general sense this oil is not proof against fire, not incombustible, not

[Scott v. Standard Oil Co.]

"fire-proof;" and hence it is that these words in that sense do not and cannot accurately indicate a grade or quality of the thing to which they are attached. But we know also that oils of the class involved here contain inflammable vapors which are evolved or thrown out at a greater or less temperature as the oil in a given instance is of a greater or less degree of density and refinement. The evolution of these vapors gives an explosive character to the oil. The baser grades will evolve these vapors it may be under normal temperature, but the higher grades will not throw off explosive vapors except when subjected to a temperature so high as practically never to exist under normal conditions—say 110 to 120 degrees—so that under ordinary circumstances the oil is not explosive, and a lighted match may be plunged into it without ignition. The grade or quality of oil in this respect is ascertained or *proved* by means of an apparatus "for proving light hydrocarbon oils by heat, to find the temperature at which they evolve explosive vapors."—Century Dict'y, p. 6250. This apparatus, or its application, is called an "oil test" or a firetest of oil; and oils which are shown to be explosive at a low temperature are said to be of a low fire-test, and those from which explosive vapors are evolved only at a high degree of heat are said to be of a high fire-test; and when it appears that the fire-test is so high as that under normal conditions the temperature is never high enough to evolve these inflammable vapors producing explosion in contact with fire, that oil is practically non-explosive, i. e. it is uninflammable, it will not explode from contact with fire, it is proof against explosion by fire, it is, in the sense of inflammability, "fire-proof oil." And in this sense, the words claimed by complainant to constitute its trade-mark must, in our opinion, be taken and understood. As first used by the complainant, they clearly gave no indication of origin or ownership of the commodity, and as they were never used by the complainant except upon a label which contained, aside from them, the most unmistakable reference to the source and ownership of the article, being none other than the full name of the complainant and of its place of business, it is not readily conceivable that they have ever been intended to indicate origin or ownership. It would be absurd to say that complain-

ant intended by their use to indicate that the illuminating oil to which they were attached was incombustible, would not burn, could not be used for the purpose of illumination. Yet they stand in an adjective relation to "oil" and are adjective in character. Bearing, as they do, no relation to origin or ownership and obviously not intended to denote incombustibility, the purpose of their use must have been to affirm that the oil was non-explosive from fire contact, that it was of that high degree of purity which is fire-proof against explosion. And this purpose of the complainant is a fact to be considered in determining whether the words themselves are descriptive of the articles to which they are attached.—*Manufacturing Co. v. Trainer*, 101 U. S. 51.

Moreover, the public knowing that the words "fire-proof" as applied to illuminating oil, could not imply incombustibility, and knowing also that such oil of a certain high degree of purity and excellence was as to inflammability and consequent explosiveness proof against fire, would and does readily and naturally understand these words in this connection to refer to and carry assurance of that valuable quality of uninflammability in oil of this kind. So that it may well be said that they are not only of a general descriptive character, but also that they aptly and unmistakably to common apprehension point out a very desirable quality or grade of the thing to which they are applied. Fully capable of this meaning and in point of fact conveying it as here used, there is no room to say that this use of them is arbitrary or fanciful. They clearly differ, we think, in this respect from the terms "Sunlight," "Daylight," "Gaslight," and "Insurance," as applied to illuminating oils, which have been protected as trade-marks ; and also even from the term "Snowflake" as applied to breads and starch, which has been denied protection because descriptive. All these terms, upon the face of them, it seems to us, are clearly fanciful in the connection they are thus used and are arbitrarily applied—not to indicate that the oil is sunlight or gaslight or daylight, nor that the light it makes is as bright as sunlight or daylight or as soft and bright as gaslight, nor any positive quality of the oil, but—as a mere fanciful name or designation for the particular commodity. And so with "Insurance Oil" and perhaps also "Snowflake" bread or

[Scott v. Standard Oil Co.]

starch (which latter, however, have been held descriptive and not appropriable as trade-marks). It cannot be said that ''Insurance'' indicates any quality in the oil to which it refers or is a generic name for oil. And at the most "Snowflake" is a mere fanciful suggestion of whiteness. But the words ''Fire-Proof'' in the sense they were used by the complainant and understood by the public are descriptive and assertative of a positive, inherent quality and a consequent high degree of excellence in the product to which they are attached; they do not present a mere similitude between the oil and other very different things having pretty and catchy names, but they refer alone to the oil and directly characterize and describe it. They are in the category of words which have been rejected for trade-mark purposes, and which embrace such terms as ''Beeswax Oil,'' ''Parriffin Oil,'' ''Macassar Oil,'' ''Invisible'' with reference to face powder, "Crack-proof" rubber goods, "Razor Steel," ''Tasteless,'' for drugs, because either descriptive or deceptive, ''Straight Cut'' tobacco, "Cable Twist Tobacco,'' &c., &c., and like these terms are not appropriable to this use, because they are descriptive.

It is of no consequence that the complainant first produced oil of this quality and first applied to such or other oil the appellation of "Fire-Proof." If, as we think, these words are descriptive, every other person who subsequently produced or dealt in oil of this quality had an equal right with complainant to the use of them in describing his product or wares. Of course the complainant might have coined a word to identify its oil and been protected in its exclusive use, but this is a very different matter from the use of words, or a single word rather—for that used is really but one compound word —which already existed as a part of the language and hence was *publici juris*.

We, therefore, conclude that the bill presents no case of infringement of a trade-mark, and that so far as it seeks an injunction of the use of the words "Fire-Proof Oil" by the defendants and an account of profits accruing to them through the use of said words, dissociated from complainant's label, it is without equity.

This conclusion will operate a reversal and remandment of the cause. The question whether the defendants have imitated complainant's *label* can better be deter-

mined in the chancery court—and in this court should there be another appeal—upon answer and proof than on the present appeal, and, since the bill on another ground clearly has equity, we will not now undertake to decide whether defendants have fraudulently or wrongfully imitated the label of the complainant; but will content ourselves with saying, what is not questioned in this case, we believe, that a manufacturer or trader is entitled to an injunction against a wrongful or fraudulent imitation of his distinctive label, though the label is not a trade-mark and contains no word, sign or symbol filling the definition of a trade-mark or to be protected as such.

The bill presents a clear case for injunction and an accounting for profits in respect of the use by the defendants of barrels bearing complainant's label which, after being sold by complainant containing oil and emptied of their contents, are bought up by the defendants, refilled with their oil and sold. This is a flagrantly fraudulent appropriation of the complainant's label and the good will attaching to it to the manifest injury of the complainant and the public.—Browne on Trade-Marks, § 443, et seq.

Unless The Southern Oil Company answers the bill, or some further showing is made that it is a partnership or a myth, service upon some agent of it should be proved before the register before decree pro confesso passes.

Reversed and remanded.

